First is Caceres Marquez v. Bondi. Ms. Hawkins. Thank you. Good morning, your honors. May it please the court, Mary Elizabeth Hawkins, on behalf of petitioners Hedy Caceres Marquez and her eight-year-old son. You'll have to speak up a little louder. Yes, good morning. Thank you. Mary Elizabeth Hawkins, on behalf of the petitioners, and I'd like to reserve two minutes for rebuttal. I'll watch my I'll focus on that, and if there's time, I'll touch on some other issues. Here, the Department of Homeland Security had the burden of showing that internal relocation within Honduras was both safe and reasonable. It was also their burden to propose an area of relocation. In this case, that area seems to be Guadalajo Viejo, the small rural village where petitioners were living before coming to the United States. The IJ, the immigration judge, engaged in some speculative fact-finding, which was pointed out in the BIA's dissent, and the BIA also misstated some of the facts in the records. But notably, the Department of Homeland Security, although it was their burden, did not elicit any testimony or really even articulate why relocation would be reasonable, given the balancing factors set forth in the regulations and in the case law. Is it required that the BIA state evidence upon which it found that it was reasonable? The BIA affirmed the immigration judge, but didn't mention the petitioner's arguments related to her health. That's different from the evidence, isn't it?  What is your position? The BIA is required to mention each of the arguments of the petitioner in order to assess them and rule on them? The BIA is required to review whether the immigration judge applied the appropriate balancing test and to consider all of the, in this case, respondents' arguments. The BIA did consider the safety of relocation, but did not consider the reasonableness. I think we probably know what it would say if it was remanded on that basis, given that there was a dissent. They said it was reasonable under all the circumstances and cited the IJ. They could have said more, but I think if it was sent back for further finding on that, I think it's pretty clear they would disagree with your position. Why did the IJ err, I think is the more fundamental question. Yes, it is the IJ decision that we should be looking to. As the dissent pointed out, the IJ claimed without record support that petitioners would be able to benefit from family support and family ties in this rural village. Now, that family support includes, as stated by the immigration judge, her now three-year-old twin U.S. citizen children, her eight-year-old child, the minor respondent, her husband, who's here and undocumented, her widowed mother, and three of her younger siblings. Now, in her credible testimony, she stated that the ages of those siblings were, at the time, one-year-old, 13, and 19. As she also credibly testified, well, there's no evidence in the record that her mother ever provided any kind of material support to her. Now, to me, it's not clear that the answer would be the same if told to answer the right question. And as I understand your argument, the right question that they need to answer is this reasonableness of internal displacement. And my concern is they kept, they're talking about the situation in Honduras a long time ago, and for her, things have changed, but we don't know how. Isn't that really the fundamental problem, is that they've elicited no information about could she work in the field with all these kids, which she didn't have before? Is there a place in the what would, in your view, if there were a remand, what would it say? Well, I think you're right that further fact-finding is required as to those things. The record as it stands now, she repeatedly said that there was nowhere for her to go. There's a letter from the landlady, her mother's friend, who took the family in after her father's murder. There's evidence that she was, in fact, supporting her family. And there's, the record is just silent as to whether there would be room for her. And as you said, her circumstances have changed. Even if, even arguing that it was reasonable for her to relocate at the age of 16, that doesn't mean it's reasonable for her to relocate now as the mother of three children. I also. What about the mental health issue? And there's also the mental health issue. Address what, where that figures in. She testified that she was in a lot of mental anguish during her time in Guadalajara, and there's a psychological evaluation in the record diagnosing her with untreated post-traumatic stress disorder. The immigration judge found that she has developed sufficient coping skills during her time in the United States, but those coping skills are largely based on her network of support that she has here and presumably based on her ability to work and support her family. What does the record specifically say about the mental health issues that she's suffering from? Can you kind of lay out what we have here on this record? Yes. Well, she talks about having nightmares, never feeling safe. Is there like a clinical diagnosis? Yes. And there is, let me find the psychological evaluation that was submitted. And also, while I'm finding that, I'd like to point out that the lead petitioner was offered for additional cross-examination at her second merits hearing. The BIA did remand this one time to the immigration judge, so he's now had two chances to get this right. Well, they didn't seem to answer the question that got remanded, right? That's right. It was remanded to look at past persecution. Right. Exactly. But the psychological evaluation starts at page 239 of the administrative record. Was that prepared for purposes of the IJ proceedings? Yes. So my understanding was that a fair amount of her stability, if you will, was related to her church and church-related activities in the United States. Was there any testimony elicited whether she could replicate that? The record was silent on that issue. The only person she testified about having ongoing contact with in Honduras is her mother. It's also notable that while she was living in this village, she had to drop out of school. The record is silent as to whether her children would have access to schooling or what that would look like. Again, as Your Honor pointed out, the record is silent as to her ability to find employment. If the proposed area of relocation is limited to this tiny village at the time she was 23 years old, I don't think it's reasonable to expect a 23-year-old mother to remain only in one village and not be able to seek employment in the city or in any other part of the country. But there is also extensive country conditions evidence in the record about the visibility of internally displaced Hondurans and why it wouldn't be safe for her to go somewhere where she doesn't have familial ties. So she would likely be trapped in this one small area. And again, the record, what it does say about her ability to support herself, talks about her family continuing to eke out survival based on subsistence farming. Her mother and other family members have been unable to find their own home. There is no evidence that she would be able to establish her own home with her husband and children as an adult now returning to Honduras. I see that my time is coming to an end. I'm happy to answer other questions. Otherwise, I'll save it for rebuttal. Did she live in Guanajuato for a period of time? Yes. For about seven years? For about seven years. That's right. Thank you. Yes. And when she left, she just had the one child who was at the time a very small child. Okay. Let's put three minutes on the clock for rebuttal when you come back. Thank you so much. Mr. Nelson, good morning. Good morning. Can you hear me? Yeah. Good morning. May it please the court, Aaron Nelson for the Attorney General, the respondent. Your Honor, when the agency found that the government rebutted the presumption of a well-founded fear for petitioner, it had to answer two questions. One, is there a location in Honduras where she can safely relocate? And two, is it reasonable under all the circumstances that she relocate there? And our position is that the record duly supports the answer is yes to both questions. And your Honor asked how long, whether she relocated to Guadalajara, for a period of time. And I think that is the linchpin for why the court should deny the petition for rebut. She relocated. Are the circumstances in Guadalajara different now than they were when she lived there before? I see no evidence of a difference. That's the point. There was no evidence offered that it was the same. It would be one thing to say, well, it's the same. We got the same farm. She can work on the farm. She can support herself. So to me, the difficulty, and I would appreciate your comments, is really the absence of evidence, which it was the government's obligation to produce. The government had the burden by a preponderance of the evidence to show that. I think it did show that. And I would submit that testimony is certainly evidence. Testimony of her own lived experience. I'm sorry. Point to the testimony as to current conditions in this town that would be parallel to what happened before, because that's the evidence that I saw in the testimony. But I want to go back and review it if you have other testimony where the government is actually eliciting evidence of what the situation is now in the house, the neighbor, the mother, the fields. I'm not sure that there is evidence of a change. I mean, that's a slightly different inquiry. She was asked about her time there. Yes. And our position is that in order for her to prevail, you have to ignore the fact that she lived there for seven years. But what age was she? From age 16 to 23. Right. And now now she's 26, 27. And her situation with children has changed, right? Right. It has.  So how is it? Is there any evidence to say, well, in Honduras, the way you work in the fields, you put the kid on the back, you go out, you can earn this amount of money and sustain yourself. Is there anything about that? Because what I found missing and I appreciate you saying, well, we look at the testimony. So I, I totally agree with you on that. But I found missing any testimony about how she's going to do this now, not what she did then. So is your honor, are you asking, are you asking how she's going to do this now that she has two extra children? Yeah. Among other things, because. In that case that's cited in the briefing, MZMMZ or MZMR. Exactly. They talk about that it's a government's burden and you have to take into account change circumstances. So she's had some change circumstances. And but we don't have testimony about how that would affect her ability to relocate. So does my understanding is that the change circumstances would more properly redound to the place where she would relocate to if we say that her chain, that the primary question is change circumstances based on children that she had here after she came here unlawfully and her husband came here unlawfully. Then effectively, we reward her for coming here unlawfully. I've heard that argument before. Well, I didn't make it in the brief, but I'm just on the spot. So she comes, let's say she comes here and she has a total mental breakdown. Let's say she comes here and she has gets cancer. Let's say now she has a total mental breakdown. She has cancer and she has eight children. And you're saying, well, that's her fault. She went to the United States illegally. I mean, that's how I understand. On the fact of her having United States citizen children here, not necessarily the health conditions, the condition. To me, the real question is, it would be easy just to remand it and say, they need to either take additional evidence or the BIA needs to take into consideration, as the dissent pointed out, what are the conditions now for her return? It may be they'll be fine. It may be upon examination. It's just that I haven't heard from you the actual testimony as to what the circumstance would be now, other than your argument. Well, it's really her fault. She came here and had these kids. Well, that is a retort to opposing counsel's claim and an answer to your question that change in her personal circumstances are such that we can't send her back now. The takeaway would be come here and have children and then the relocation analysis is a nullity. No, it's not a nullity. It may well be depending on the village. It may well be that the mother would be willing to take care of the kids. It may well be that there's child care facilities in the fields. I don't know. I'm not sure how that examination or how that evidentiary proffer works. Well, it works by simply asking her questions. Who will take care of your children? Exactly. I mean, we just don't have the evidence is all I'm saying. We have evidence of country conditions, a social reflection of familial relationships in Honduras, wherein the family unit is tight, where it is odd or it is unusual for people to leave their family very far. And I would say we could deduce that. But we can deduce. But is there any, do we have any evidence about the farm that she could return to? Do we have any evidence about the farming situation there now? It's just that there's an absence of evidence is what concerns me. And it could be the evidence is there. It may well be that the answer would be the same after remand, but it would then be based on a record that took into account. And I think just to understand your argument, you're suggesting, well, the only circumstances you take into account are the ones in the village, not her circumstances. No, it's a balancing. I mean, the factors are, is there civil strife in the place of relocation? We have no evidence of that. Are there geographical limitations? She left Aguas Calientes to this remote village, Guadalajara, and lived there for seven years. There's no evidence that she cannot go back there. And then social and cultural factors. Her age, she's young. She's physically healthy. Her gender, she's female. There is evidence that there's gender-based violence in Honduras, but she has never experienced in her 23 years there, gender-based violence. She has never experienced physical assaults or threats. Again, her health and her familial ties. So I would agree that the immigration judge perhaps spoke indelicately in saying that she could be returning with her husband and her twin two-year-olds could aid her. I think that the immigration judge was taking account of that factor that has to be weighed. And it's not just that she has two more children now, so that's her own fault. It's a balancing text of all of it. They talk like the toddlers can assist her. I said that's an indelicate... It's just wrong. Well, her husband can assist her. But they didn't say that. No, actually, I believe it does that. She could be assisted by returning with her children and her husband if he chooses to go. Now, let's look at the husband. She says that she stayed seven years under constant threat, although what we have on the constant threat is an individual named Jose in the previous town or village who relays to the mother 10 times, round number 10 times, that the guys who killed your husband slash father are looking for you. And so she says that she was under constant threat of imminent harm. That's just not what the evidence says. And she says that she stayed there for seven years. They assumed past persecution. Right, right. So we don't need to... I mean, maybe they would reconsider that. I don't know. But they assumed past persecutions. We don't have to go into all of that. What we're really focusing on is whether under the regulations they've given account as required. I was going in a roundabout way to explain how the husband could help her. She was in the relocation spot for seven years, unharmed. It was subsistence farming. It wasn't great. That's not necessarily the measures. The husband could help her how? What's in the record about that? So here's how the husband could help her. There's equivocal evidence on why she stayed there seven years. I was living in hiding. I had to help my siblings, et cetera. There's also a pretrial brief for the first time around to the immigration judge in which she says, I stayed there while my husband, who came to Washington state illegally, while he gathered enough money to then send for me. So the husband could help her get here and she was able to cross several... That might be true, but that's not what's in the record. So I think... I asked you for the record sites and today, sitting here, I haven't heard any. But I appreciate... I think I understand your argument. Okay. Any other questions? Otherwise, I'll rest. Thank you, Mr. Nelson.  Thank you, your honors. I have just a couple of points I'd quickly like to respond to, and then I'm happy to answer additional questions. With respect to the time that petitioners have been here, I think it's important to note that they first arrived in the United States, attempted to come in July of 2021. They weren't actually able to enter until September. They filed for asylum within a month and they had their individual hearing the following February. So all of the delay that has taken place between February 2022 and now has been due to the government's errors in adjudicating this case. In terms of updated evidence, most of the evidence does come and with respect to the conditions in Guadalajara does come from that February 2022 hearing. Again, the government had the opportunity to elicit additional testimony to ask questions or to introduce more evidence in 2024. They declined to do so other than the general Department of State human rights reports. So Mr. Nelson, though, says, look, she has a husband, she's got the mother, and so she can go back, work in the fields and the husband can help her. What's the response to that? Well, the record is just largely silent on that score. It is true that when she was living there before, there is some indication that she was for part of that time potentially supported by remittances from her husband, but it's just not clear. And so because the burden of proof is on the government, the immigration judge's findings about how these family members are supposed to be helping her, about the economic opportunities that she would have in this place are just not supported by substantial evidence in the record. I have two maybe questions or concerns with the position. I mean, one is sometimes in these relocation findings, we're talking about sending a person to a different part of the country that's safer, but where they have no connection whatsoever. But he or she did live there for seven years, seemingly unharmed with other family members. And so is it not a reasonable inference from the record that it'd be reasonable to go back to a place that she had at least some degree of support in and lived safely in before? Well, familial ties are one of the factors that should be considered. And so to the extent that this isn't a place where she would be totally alone, that would be appropriate for the agency to consider. But again, what the record says is that she was the one supporting her mother, that her remaining siblings are much younger. And really, the record is silent as to what her husband does, could do, what resources he has. There's just no evidence there. Let me ask you, just kind of getting to the second question or concern I would have. If you fast forward in the case and there are further proceedings on it, what would the protected ground of persecution and the nexus to that ground that would end up being the basis for asylum or withholding of removal? Well, we argued, we proposed several particular social groups below based on her family membership, based on being a witness to a crime. All of those things I think would likely have to be updated below. But I understand the concern about not wanting this case to keep going back and forth. But really, this court can only uphold the agency based on their own reasoning. And unfortunately, despite two opportunities, the immigration judge declined to analyze her case. And so we hope that the third time would be the charm. But regardless, she's entitled to a full and fair hearing of her claims and a consideration. She came to this country and diligently applied for asylum and trusted that she would be afforded the opportunity to have her protection claims heard. Thank you very much. We thank both counsel for the briefing and argument. This matter is submitted.
judges: McKEOWN, BEA, BRESS